02-10-166-CV














 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-10-00166-CV 

 

 


 
 
 Wells Fargo Bank, N.A.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Peggy Blackburn
 
 
  
 
 
 APPELLEE 
 
 


 

 

----------

 

FROM THE
415th District Court OF Parker
COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I.  Introduction

Appellant
Wells Fargo Bank, N.A. raises three issues challenging the trial court’s
judgment that it take nothing on its claims against
Appellee Peggy Blackburn for breach of contract and account stated.  Wells Fargo claims that Peggy is liable for
the charges incurred on a Wells Fargo Visa credit card; Peggy argues, and the
trial court found, that she was merely an authorized user of the credit card
and was not personally liable for the debt on the credit card.  For the reasons set forth below, we will
affirm the trial court’s judgment.

II.  Factual and
Procedural Background

Peggy
was married to Gilden Blackburn (“Gil”) in 2002.  In 2002, Gil obtained Wells Fargo Visa credit
cards with an account number ending in 9904; Gil was the accountholder, and
Peggy was simply an authorized user of the credit card.[2]

After
the Wells Fargo Visa credit card account had been opened, Peggy inquired about
getting rewards points for airline tickets.  Wells Fargo told Peggy that all she had to do
to was complete an extra benefits form.  According
to Peggy, a private banker at Wells Fargo completed the portion of the form pertaining
to Peggy’s information, and Peggy signed the form at the bank.  Peggy did not recall anything being on the
form except her signature; the box beside “Add a Joint Accountholder” was not
checked.  When the private banker went to
her computer to activate the benefits, she told Peggy that she was not
authorized to apply for benefits because Gil was the accountholder.  The private banker told Peggy to take the form
home and have Gil sign it.  After Gil
signed it, he “took it from there.”

Gil and
Peggy used their Wells Fargo Visa credit cards up until 2006. Peggy filed for
divorce in January 2006.  Gil
subsequently called Wells Fargo to cancel the Visa credit card because he did
not want to be held responsible for charges on that account.  The last time that Gil used the Visa account
ending in 9904 was prior to March 10, 2006.

In
March 2006 after Peggy had filed for divorce, she went to buy gas one day, and her
Wells Fargo Visa credit card was declined; Peggy discovered that the credit
card account had been frozen.  The
following week, she received a letter from Wells Fargo stating that Gil had
closed the account and had told them that Peggy would assume responsibility for
the outstanding balance.  Peggy tried to
get the account ending in 9904 reinstated in March 2006 after Gil had closed
it, but Wells Fargo told her that she was not authorized to make changes to the
account because she was only an authorized user on the account, not the accountholder.
 Peggy then asked her divorce lawyer to
send Gil a letter requesting that he reactivate the account.  Gil thereafter told her that he had
reactivated the account,[3] and she
received a credit card with an account number ending in 3155.[4]  Peggy testified that Wells Fargo never asked
for any financial information from her in connection with the issuance of the
replacement credit card and that she never supplied any financial information
to Wells Fargo.

Gil
testified that he did not learn that Wells Fargo had issued Peggy a Visa card
ending in 3155 until April 2007 when he received a letter from Wells Fargo
demanding $60,000.  Gil claimed that he immediately
contacted Wells Fargo and explained that he had not made any of the charges and
had never used that account.

According
to Peggy, right before Gil apparently closed the 9904 account, she had received
a bill on the 9904 account and had contacted Gil to see which charges were his;
when some charges on the card apparently were not made by either Gil or her,
she called Wells Fargo to report unauthorized charges on the account.  Wells Fargo told her that their policy was to
report the card as lost or stolen, to freeze that account, to open a new
account with a new number, and then to credit the account for the items that were
not charged by the users.  Wells Fargo
then issued the card on the 3155 account. 
Peggy used the new account and testified that she incurred all of the
charges on the 3155 account––$61,000—“to meet the needs of [her] kids,”
including paying for her daughter’s wedding.

In
November 2007, Peggy wrote a letter to Wells Fargo that used the term “joint
credit card.”  Peggy testified that when
she used the term “joint credit card” in her letter to the bank, she did not know
that the term had a legal meaning; she simply meant that she considered it her
joint responsibility to provide for her children.  She stated that the responsibility for the
debt “is obviously in both our names.”

Peggy
spoke with Mary at Wells Fargo in December 2007.  Mary spoke with her supervisors before asking
for Gil’s address.  After Peggy gave
Gil’s address to Mary, Peggy did not receive anything else from Wells Fargo.

            Peggy testified that she did
not ask to become a joint accountholder and that there was never any discussion
about her becoming a joint accountholder.  Wells Fargo told her that she was a joint
accountholder only after she had incurred the charges on the 3155 account.  However, Peggy testified that there was also a
time after those charges were incurred when Wells Fargo told her that she was
not liable on the debt.

          Leo Holloway, a paralegal and record keeper
at Wells Fargo, testified that he was familiar with the statements related to
the account ending in 9904 and the account ending in 3155.  Holloway testified that when
the account ending in 9904 was opened in March 2002, Peggy was not personally
liable because the account was set up as an authorized user account with Peggy
as an authorized user; on the initial form to open the account, “additional
cardholder” was circled, rather than joint accountholder, and Gil did not apply
for the rewards points program.  The credit
card agreement disclosures were sent to Gil when the account was opened.

Holloway
testified that Peggy became a joint accountholder on December 3, 2003, and
became “primary liable” at that point.  Holloway
said that he relied on the “Add a Joint Accountholder” part of the “Extra
Benefits Request Form” to reach that conclusion, but he admitted that he did
not know who had put a check mark in the box next to add a joint accountholder.
 Holloway was positive that no one at
Wells Fargo would have completed that form.  He assumed that Gil or Peggy had completed the
form, but he had no personal knowledge of whether the form was filled out
before Peggy signed it.  Wells Fargo
never asked Peggy to submit financial information to justify the extension of
credit to her, but Holloway said that such information is not required if the person
becomes a joint accountholder.

          Wells Fargo received a call from Gil
on or about March 10, 2006, stating that he was going through a divorce and
requesting that the account ending in 9904 be closed.  Wells Fargo could not close it because there
was a second cardholder.[5]  So Wells Fargo froze the account.

          Shortly thereafter, Peggy called and
reported the credit card as lost or stolen, and the account was “reopened” with
an account number ending in 3155 and was listed under Gil’s and Peggy’s names.  After the account ending in 9904 was reported
as lost or stolen, it was closed on April 4, 2006.  The balance of $5,568.23 was then transferred
to the account ending in 3155.

          Holloway testified that at one point, Peggy
returned a call from Wells Fargo and was “very upset” because Gil had not agreed
to pay the total amount due.  Peggy felt
that she should not have to pay the total amount due.  The problem was referred to Kim, who is a
supervisor, to “make sure that there is a secondary cardholder.”  Holloway thereafter examined notes from Wells
Fargo’s system dated July 16, 2007, which showed that the account was
transferred “to Kim so we can find out how she [Peggy] became secondary
accountholder instead of authorized or just a signer, which was her role on
account before.  NL1 closed in 3-06.”  Holloway explained that a “secondary
accountholder” is a “joint cardholder” and that a joint cardholder has joint
and several liability.

In
December 2007, Wells Fargo quit sending statements to Peggy and started sending
them to Gil because the skip tracing department found a new address for Gil in
Weatherford and sent the December 20, 2007 statement to that address.[6]  The notes from Wells Fargo’s computer records
dated December 21, 2007, show that the account was “under primary and
authorized user.”  Holloway did not
interpret this note to mean that Wells Fargo had determined that Peggy was just
an authorized user.  Holloway said that
it would not be correct to say that Mary told Peggy that Wells Fargo had
reviewed the account and had determined that Peggy was only an authorized user
and had no personal liability, so from December on they were going to send the
statements to Gil.  On December 26, 2007,
the notes indicate that there was no authorized user and that Wells Fargo quit
talking to cardholder one and cardholder two[7] and
found that both were responsible for the debt.

Holloway
did not bring copies of checks to show who had made
payments on the account.  As of the
trial, the balance due on the account ending in 3155 exceeded $61,000.[8]
 Holloway testified that Wells Fargo did
not receive a dispute of charges from Peggy. 

III.  Findings of Fact and Conclusion of Law

After
hearing the evidence above, the trial court made the following findings of fact:

1.       On or about March 13, 2002, Gilden B. Blackburn (“Gil Blackburn”) applied (the
“application”) for a Wells Fargo Bank, N.A. (“Wells Fargo”) credit card;

 

2.       The application was written and entitled
“Private Client Services Visa Platinum Application”;

 

3.       The original Wells Fargo account number
was [XXXXXXXXXXXX]9904;

 

4.       On or around April, 2006, the original
account was changed to account number [XXXXXXXXXXXX]3155;

 

5.       Wells Fargo was attempting to collect
indebtedness incurred under both account numbers;

 

6.       Peggy Blackburn was the spouse of Gil
Blackburn at the time of all credit applications;

 

7.       Wells Fargo admitted that Peggy Blackburn
was not personally liable for charges on the account;

 

8.       On or about December 3, 2003, Peggy Blackburn
signed a Wells Fargo “Extra Benefits Request Form” (the “form”) for the sole
purpose of accessing the “extra benefits,” including reward points, etc., available
by use of the account[;]

 

9.       Peggy Blackburn signed the form in blank
without any handwriting contained thereon;

 

10.     Peggy Blackburn did not manifest an intent to be personally liable on the account;

 

11.     A Wells Fargo representative completed the
form, including identifying Peggy Blackburn as a joint account holder, after
the form was executed by Peggy Blackburn;

 

12.     Neither Peggy Blackburn nor Gil Blackburn
could identify whose printed handwriting was contained on the form;

 

13.     Wells Fargo’s computer records in July and
December 2007 indicated that Peggy Blackburn was an “authorized user” of the
account;

 

14.     In 2007, Wells Fargo supervisors reviewed
the account to determine whether Peggy Blackburn was personally liable for any
charges;

 

15.     It was determined by Wells Fargo that Peggy
Blackburn was not personally liable for charges on the account;

 

16.     Starting in 2007 Wells Fargo sent all
monthly account statements and demands for payment to Gil Blackburn and not
Peggy Blackburn;

 

17.     The Wells Fargo “Customer Agreement and
Disclosure Statement” was stamp dated April 14, 2008;

 

18.     An interest rate for account balances was
not shown;

 

19.     Wells Fargo never attempted to secure
credit information from Peggy Blackburn;

 

20.     Peggy Blackburn never requested an
extension of credit to her from Wells Fargo;

 

21.     The form was used for multiple purposes––not
only for adding a joint account holder––but also for accessing the “Rewards
Benefit” program;

 

22.     Gil Blackburn and Peggy Blackburn made
charges to the account; and,

 

23.     Gil Blackburn paid monies to Wells Fargo on
the account.

 

Among
the conclusions of law, the trial court concluded that “Wells Fargo and Peggy
Blackburn did not have a contract covering the above-stated account numbers.”

IV. 
Evidence Supports Trial Court’s Finding That Peggy Is

Not Personally Liable on Account

 

In
its first issue, Wells Fargo argues that Peggy is personally liable on the
account.  Wells Fargo specifically
challenges findings of fact 7, 10, 13, 15, and 18.[9]

Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury=s
answers to jury questions.  Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex.
1991).  The trial court=s
findings of fact are reviewable for legal and factual sufficiency of the
evidence to support them by the same standards that are applied in reviewing
evidence supporting a jury=s
answer.  Ortiz v.
Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel,
881 S.W.2d 295, 297 (Tex. 1994).  When findings of fact are filed and are
unchallenged, they occupy the same position and are entitled to the same weight
as the verdict of a jury; they are binding on an appellate court unless the
contrary is established as a matter of law or there is no evidence to support
the finding.  McGalliard
v. Kuhlmann, 722 S.W.2d
694, 696 (Tex. 1986); Rischon Dev. Corp. v.
City of Keller, 242 S.W.3d 161, 166 (Tex. App.CFort
Worth 2007, pet. denied), cert. denied, 129 S. Ct. 501 (2008).

We
may sustain a legal sufficiency challenge[10] only
when (1) the record discloses a complete absence of evidence of a vital fact;
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (3) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder
could and disregard evidence contrary to the finding unless a reasonable factfinder could not. 
Cent. Ready Mix
Concrete Co. v. Islas, 228 S.W.3d 649, 651
(Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).  If a party is attacking the legal sufficiency
of an adverse finding on an issue on which the party had the burden of proof,
and there is no evidence to support the finding, we review all the evidence to
determine whether the contrary proposition is established as a matter of
law.  Dow Chem. Co.
v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); Sterner v. Marathon Oil Co.,
767 S.W.2d 686, 690 (Tex. 1989).  Anything
more than a scintilla of evidence is legally sufficient to support the
finding.  Cont’l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).  

In
the record before us, the evidence conclusively establishes that Peggy was an
authorized user under the original account application, in which “additional
cardholder” is circled and in which “joint accountholder” is not circled.  The key document in dispute is the extra
benefits form.  Peggy was the only person
involved with the extra benefits form who recalled its execution; Holloway was
not present when the form was signed, and Gil did not recall signing the
form.  The trial court thus had before it
only Peggy’s testimony as to her reasons for signing the form and who completed
which portions of the form.

Peggy
testified that she signed the form to obtain airline miles from the use of the
credit card.  Peggy went to Wells Fargo
where a private banker completed the portion of the extra benefits form with
Peggy’s information––the box beside “Add a Joint Accountholder” was not checked––and
then had Peggy sign it.  After reviewing
the account information on her computer screen, the private banker then told
Peggy that she could not apply for the rewards benefits because Gil was the
accountholder.  The private banker never
discussed having Peggy become a joint accountholder and never requested
financial information from Peggy.  The
private banker told Peggy to take the form home and to have Gil sign it.  The record includes a copy of the form and the
mailer with the bank’s return address on it; the form appears to have been
mailed back to the bank and is stamped:

RECEIVED

DEC 02 2003

PO BOX 10347

 

Thus,
more than a scintilla of evidence exists in the record that Peggy did agree to
be personally liable on the account and that Peggy did not check the box to
become a joint accountholder.  Evidence
also exists––by virtue of Wells Fargo’s rejection of the extra benefits form
when it contained only Peggy’s signature and by its requirement that the
cardholder (Gil) complete the extra benefits form and mail it back––that Peggy
was not a joint accountholder but only an authorized user without the ability
to make changes to the account.  Moreover,
Wells Fargo’s own records indicated that Peggy was only an authorized user on
the account as of December 2007, and Peggy testified that Wells Fargo had told
her that she was not personally liable on the account.  The customer agreement[11] that
was on file with Wells Fargo and that was admitted into evidence states, with
regard to an additional cardholder, “If another person has use of your account
and you want to end the person’s privilege, you must recover and return that
person’s credit card, if any.”  The
record contains no evidence that Gil ever recovered and returned Peggy’s credit
card for the account ending in 9904 or the account ending in 3155.

Considering
the evidence favorable to the trial court’s findings of fact that a reasonable factfinder could and disregarding evidence to the finding
unless a reasonable factfinder could not, we hold
that more than a scintilla of evidence exists supporting the trial court’s
findings of fact number 7, 10, 13, and 15. 
See Cent. Ready
Mix Concrete Co., 228 S.W.3d at 651;
City of Keller, 168 S.W.3d at 807, 827; Best Bumper Supply, Inc.
v. Coterill, No.
08-02-00021-CV, 2004 WL 2067598, at *2, 7 (Tex. App.––El Paso Sept. 15, 2004,
no pet.) (mem.
op.) (holding that ample evidence supported the
findings of fact and conclusions of law challenged by appellant because the
record revealed that there was no credible evidence that wife acted improperly
with regard to her use of the American Express account on which she was an authorized
user).  Because the evidence supports
these findings, we need not address Wells Fargo’s challenge to finding of fact
number 18 regarding the interest rate.  See Tex. R. App. P. 47.1 (requiring
court of appeals to address only issues necessary to final disposition of
appeal).

In
its reply brief, Wells Fargo argues that under Winchek v. Am. Express Travel Related Servs. Co., 232 S.W.3d 197, 204 (Tex. App.––Houston
[1st Dist.] 2007, no pet.), Peggy’s use of the Visa credit card created a contract.
 Winchek, however, dealt with the credit card company’s
failure to deliver a copy of the signed cardholder agreement to the cardholder,
not the scenario we have before us in which an authorized user never signed
paperwork to become a cardholder who would be liable on the account.  Peggy’s acknowledgement that she used the
account ending in 3155 does not, unlike the reply brief contends, constitute an
indication of liability; her use of the account was as an authorized user who
was not liable.  Simply put, the evidence
supports the trial court’s conclusion that Wells Fargo and Peggy Blackburn did
not have a contract covering her accounts ending in 9904 or 3155; Wells Fargo failed
to obtain the necessary paperwork to hold Peggy liable on the accounts.  We therefore overrule Wells Fargo’s first
issue.[12]

V.  Peggy Was
Not Required to Plead Any Verified Denials

or Affirmative Defenses

 

In
its second issue, Wells Fargo argues that Peggy was required to plead that she
lacked the intent to become a joint accountholder as an affirmative defense.[13]  Wells Fargo relies on Texas Rule of Civil
Procedure 94 in making its argument.  But
intent is not specifically listed as an affirmative defense under that rule.  See
Tex. R. Civ. P. 94.  An affirmative
defense does not tend to rebut factual propositions asserted by a plaintiff,
but rather it seeks to establish an independent reason why the plaintiff should
not recover.  Gorman v. Life Ins. Co.
of N. Am., 811 S.W.2d 542, 546 (Tex.), cert. denied, 502 U.S. 824
(1991).

Here,
Peggy does not assert that she executed paperwork making her a joint
accountholder but did not intend to; she asserts that she never completed any
paperwork making her a joint accountholder. 
Thus, intent is not an affirmative defense here.  Gonzales
v. Pan Am. Nat’l Bank, 692 S.W.2d 111, 111 (Tex. App.––Dallas 1985, no
writ) (stating that “[a]ffirmative defenses, as
opposed to a defendant’s denials, are the propositions which a defendant may
assert and interpose to defeat a prima facie case made by the plaintiff”).  Wells Fargo nonetheless argues that lack of
intent is analogous to failure of consideration, which is listed as an
affirmative defense in rule 94, but Wells Fargo cites no case law to support this
argument, and we have located none.  We
overrule Wells Fargo’s second issue.

In
its third issue, Wells Fargo argues that Peggy waived the defense that she was
not liable for payment of the account by failing to plead that she was not
liable in the capacity in which she was sued.  Wells Fargo contends that because Peggy’s
defense was that she was not liable because she was not a joint accountholder,
she should have pleaded the defense that she was not liable in that
capacity.  Wells Fargo, however, never
specifically pleaded that Peggy was liable as a joint accountholder.  Instead, Wells Fargo’s original petition
defines Peggy as an individual and Gil as individual and defines “BLACKBURN” as
referring to both Peggy and Gil.  All
causes of action pleaded by Wells Fargo are asserted against “BLACKBURN,” even
though some of the actions referred to––e.g., that “BLACKBURN” was the basic
cardholder on the Account––clearly refer to only one individual (in the
previous example, Gil).

But,
to the extent that Wells Fargo’s pleading can be construed to contain a cause
of action against Peggy for joint liability on the account, Peggy included in
her first amended answer two verified denials: 
she denied execution by herself or by her authority of any instrument in
writing upon which Wells Fargo’s pleadings were founded, and she denied the
account that is the foundation of Wells Fargo’s action.  Because Peggy filed these denials, we cannot
agree with Wells Fargo that, somehow, Peggy “waived the defense that she was
not liable for payment of the account by failing to plead that she was not
liable in the capacity in which she was sued.”  We overrule Wells Fargo’s third issue.  See,
e.g., Tex. R. Civ. P. 93(2); Booher v. Criswell,
531 S.W.2d 844, 844 (Tex. Civ. App.––Dallas 1975, no writ) (holding that
appellant’s verified denial was sufficient to put appellee
on proof of his claim on the account sued upon); White v. Jones, No. 14-97-00035-CV, 1999 WL 250721, at *4 (Tex.
App.—Houston [14th Dist.] Apr. 29, 1999, no pet.) (not designated for publication) (holding
that verified answer that specifically denied each and every item in sworn
account was sufficient to put plaintiffs to their proof).

VI.  Issue Raised Solely
in Reply Brief Is Waived

In
its fourth issue in its reply brief, Wells Fargo argues that the trial court
erred by refusing to admit the parties’ mediated settlement agreement regarding
their divorce.  Because this issue was
not raised in Wells Fargo’s initial appellate brief, we hold that it is
waived.  See Priddy v. Rawson, 282 S.W.3d 588, 597
(Tex. App.––Houston [14th Dist.] 2009, pet. denied) (stating that the Texas
Rules of Appellate Procedure do not allow an appellant to include in a reply
brief a new issue not raised in the appellant’s original brief); see generally Tex. R. App. P. 38.3.  We overrule Wells Fargo’s fourth reply issue.

VII.  Conclusion

Having
overruled all of Wells Fargo’s issues, we affirm the trial court’s judgment.

 

 

SUE WALKER
JUSTICE

 

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

 

DELIVERED:  February 3, 2011











          [1]See Tex. R. App. P. 47.4.





[2]There
were two authorized users on the account: 
Peggy and her daughter.  A record
keeper with Wells Fargo testified that an “authorized user” is not personally
liable for the debt, and an account with an authorized user typically involves
a parent/student situation.  He further
testified that authorized users’ names are not on the account, and authorized
users do not get the information reported on their credit reports.





[3]Gil testified that in
response to the letter, he did not reinstate the Visa account.





[4]Peggy testified that Gil knew about
the 3155 card and told her to cut it up.





[5]Holloway
testified that Wells Fargo’s computer records indicate that Peggy’s role
changed in March 2006, but it does not indicate a change from a signer to an
accountholder.





[6]Gil testified that he
now lives in Weatherford but that he previously lived in Lipan, Texas, with
Peggy from July 2005 until November 2005 when he moved out.





[7]Holloway
explained that when the notes from the computer records say that a Wells Fargo
representative spoke with a cardholder, that is not an
authorized user.  This contradicts his
conclusion that Peggy was originally an authorized user on the account because
“additional cardholder” was circled on the initial application for the credit
card.





[8]The
statement from January 4, 2008 shows a balance of $61,177.50. Holloway
said that the trial court would have to refer to statements for a finance
charge rate because there are no supplemental disclosures other than those
noted on the statements of a fixed rate account. 





[9]Wells
Fargo states in its brief, “The vast majority of the Court’s Findings of Fact
are not supported by the evidence. 
Rather than outline each Finding of Fact individually, the most
erroneous are discussed below.”





[10]Wells
Fargo does not set forth any standard of review in its brief.  Wells Fargo, moreover, does not specify
whether it is challenging the legal or factual sufficiency of the trial court’s
findings; it states only that “[t]he vast majority of the Court’s Findings of
Fact are not supported by the evidence.” 
We will review the trial court’s findings of fact for legal sufficiency.





[11]The
customer agreement was dated April 14, 2008. 
Holloway testified that he did not make an effort to find the agreement
that might have existed in 2002 when Gil opened the account.





[12]We
likewise overrule the first, second, third, and fifth issues raised
in Wells Fargo’s reply brief, which all deal with the findings of fact and
conclusions of law.





[13]Wells
Fargo’s second issue is set forth as “Peggy Blackburn waived the defense of
alteration of the Form without her authority when she failed to plead it as an
affirmative defense under Tex. R. Civ. P. 94.” 
Wells Fargo, however, did not brief an argument related to the defense
of alteration; instead, it briefed an argument regarding the defense of lack of
intent.  We hold that Wells Fargo
therefore waived its argument regarding any such failure on Peggy’s part to
plead an affirmative defense for alteration of the form.  See
Tex. R. App. P. 38.1(i); Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284
(Tex. 1994) (citing the long-standing rule that a point may be waived due to
inadequate briefing).